# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**VANCE MURRAY, ERIC BURCH,  TYLER
RICHARDSON, MARIUS RICHARDSON,
JORDAN SHANK, and GABRIEL TAVERA**

|  |  |
|---|---|
| Plaintiffs, | **Case No.** |
| v. | **Hon.** |

**UNITED ELECTRICAL CONTRACTORS,
INC.,**

Defendant.

---

**MILLER COHEN, P.L.C.**
Richard G. Mack (P58657)
Andrea F. Frailey (P82466)
*Attorneys for Plaintiffs*
7700 Second Ave, Ste 335
Detroit, MI 48202
(313) 964-4454
richardmack@millercohen.com
afrailey@millercohen.com

---

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

There is no other civil action pending
in this Court or any other Court arising
out of the same transaction and
occurrence.

_____
Richard G. Mack, Jr.

**NOW COME** Plaintiffs, by and through their attorneys, MILLER COHEN,

P.L.C., for their Complaint against Defendants, they state as follows:

1

## **INTRODUCTION**

1.      This case concerns obscenely racist behaviors and practices exhibited by mid to high-level management at United Electrical Contractors, Inc. ("UEC" or "Defendant") These managers also tolerated racial harassment from hourly employees against their African-American and Latinx co-workers.

2.      Plaintiffs were electricians at UEC who had firsthand experience of the rampant racism demonstrated at every level at UEC.

3.      For example, a UEC employee told Plaintiff Marius Richardson to "hurry up before I pull out my whip;" a UEC Foreman heard this comment and laughed.

4.      A UEC Foreman told Plaintiff Eric Burch that Plaintiff was "a boy on a slave ship" and that he should "go back to [his] plantation."

5.      Racial slurs, such as the word "nigger," were a part of the near-daily vocabulary of many White employees and managers.

6.      White employees were consistently treated better than non-White employees; for example, White employees were given rides to the jobsite whereas non-White employees had to walk.

7.      Plaintiff Gabriel Tavera was repeatedly referred to as "Brown Boy" and asked if he was Mexican or a "nigger."

8.      Plaintiff Vance Murray did not receive a company credit card while he worked as a foreman, however, White foremen did receive such cards even when used inappropriately.

9.      When Plaintiffs complained about the disgusting harassment they faced, they were told they needed to be "tougher" to work in the trade, to not "worry" about the harassment, or they were simply ignored.

10.     Plaintiffs Gabriel Tavera, Marius Richardson, and Tyler Richardson were laid off during the COVID-19 pandemic, supposedly due to lack of work. However, White employees with less seniority were not laid off.

11.     Finally, when Plaintiff Jordan Shank stood up against the rampant racism on UEC jobsites, UEC retaliated against him by forcing him to dig trenches by hand while other employees were able to use a backhoe.

12.     Plaintiffs pursue this cause of action for all damages to which they are entitled under law.

## **PARTIES**

13.     Plaintiff Vance Murray ("Mr. Murray") was hired by Defendant in August 2015 as an Apprentice Electrician.  Mr. Murray worked as a Foreman for Defendant from 2017 until his employment ended in May 2021.  Mr. Murray is a resident of Oakland County, Michigan and worked in Michigan during all relevant times in this action.

14.     Plaintiff Gabriel Tavera ("Mr. Tavera") was employed by Defendant as an Apprentice Electrician from August 2020 through October 2020. Mr. Tavera is a resident of Jackson County, Michigan and worked in Michigan during all relevant times in this action.

15.     Plaintiff Marius Richardson ("Mr. M. Richardson") was employed by Defendant as an Apprentice Electrician from January 2020 through October 2020. Mr. M. Richardson is a resident of Clinton County, Michigan and worked in Michigan during all relevant times in this action.

16.     Plaintiff Eric Burch ("Mr. Burch") was employed by Defendant as an Apprentice Electrician from March 2020 through October 2020. Mr. Burch is a resident of Grand Traverse County, Michigan and worked in Michigan during all relevant times in this action.

17.     Plaintiff Tyler Richardson ("Mr. T. Richardson") was employed by Defendant as an Apprentice Electrician from August 2020 through October 2020. Mr. T. Richardson is a resident of Ingham County, Michigan and worked in Michigan during all relevant times in this action.

18.     Plaintiff Jordan Shank ("Mr. Shank") was employed by Defendant as an Apprentice Electrician from January 2019 through October 2020. Mr. Shank is a resident of Montmorency County, Michigan and worked in Michigan during all relevant times in this action.

19.     Defendant, United Electrical Contractors, Inc., is an electrical contracting company based in Lansing, providing electrical contracting services across Michigan.

## JURISDICTION

20.     This Court has original jurisdiction over Plaintiffs' claims arising under 42 U.S.C. § 1981, *et. seq.*

21.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims.

22.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b).

23.     Once the EEOC has issued Right to Sue Notices in the six charges brought by the individual Plaintiffs in this matter, Plaintiffs will amend this Complaint to add claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et. seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.*

## PLAINTIFF GABRIEL TAVERA'S GENERAL ALLEGATIONS

24.     Mr. Tavera, a Mexican American individual, worked as an Apprentice Electrician reporting to several different foremen, who in turn reported to Project Manager Jeremy Tolliver.

25.     The below paragraphs outline some of Mr. Tavera's complaints of racism and discrimination that he experienced and witnessed firsthand.

26.     During Mr. Tavera's tenure at UEC, he observed White employees receiving preferential treatment on many occasions.

27.     For instance, the foreman would give White employees a ride in his truck from the parking lot to the job site, whereas non-White employees, including Mr. Tavera, would have to walk.

28.     White apprentices were consistently assigned to journeymen who were known to be high quality trainers, whereas non-White apprentices were assigned to journeymen who would not train them and who would get angry if the apprentice asked questions.

29.     In the buildings the employees worked on, White employees were able to choose the rooms they worked on before non-White employees and therefore, White employees worked in rooms that were cleaner and less cramped.

30.     If non-White employees returned to the jobsite after lunch even five minutes late, they would be disciplined, whereas White employees were regularly allowed to come back over a half hour late with no discipline.

31.     White employees were regularly assigned to work on various different job sites, whereas Mr. Tavera and other non-White employees were only assigned to work one job site.

32.     Employees assigned to certain jobsites were paid more and only White employees were assigned to work at these sites.

33.     Working at a variety of different jobsites allowed White employees to learn more about the trade.  This training opportunity was generally denied to non-White employees.

34.     Mr. Tavera heard White employees and White managers use the word "nigger" almost daily – both directed at and referring to Black employees.  This bothered him greatly, even though he is not Black.

35.     White employees constantly harassed Mr. Tavera on the basis of his national origin by calling him "Brown Boy," asking him if he was Mexican or a "nigger," telling him to go back to Mexico (despite Mr. Tavera having been born in the United States), calling him "beaner," "spic," and "wetback," and asking him if jumping down from a ladder reminded him of when he "jumped the border wall."

36.     Mr. Tavera also heard White employees discuss how other Hispanic workers were "thieves" because they did not speak English and refer to these workers as "border jumpers" along with other racial slurs.

37.     At one point, a foreman on the jobsite called a meeting to discuss missing tools, and several White employees spent the entirety of the meeting stating that the Hispanic workers must have stolen the tools and using several different racial slurs.

38.     Management did nothing to stop these employees from using this language above.  In fact, the foreman laughed at the slurs.

39.     Defendant was aware of the harassment experienced by Mr. Tavera because its managers often witnessed, and participated in, said harassment.

40.     When Mr. Tavera was laid off, he was told by Jeremy Tolliver that the layoff was due to lack of work and was carried out in seniority order.

41.     Multiple White employees who were hired after Mr. Tavera were not laid off at the same time as Mr. Tavera.

### PLAINTIFF VANCE MURRAY'S GENERAL ALLEGATIONS

42.     Mr. Murray, a Black individual, worked as an Apprentice Electrician for Defendant from 2015 until 2017 when he started working as a foreman.

43.     The below paragraphs outline some of Mr. Murray's complaints of racism and discrimination that he experienced and witnessed firsthand.

44.     During Mr. Murray's tenure at UEC, he observed White employees receiving preferential treatment on many occasions.

45.     For instance, Mr. Murray witnessed Black employees being given more physically demanding work while White employees were given more technical work that would help them learn and advance in the trade.

46.     Mr. Murray witnessed Black employees being given tasks that they were not trained to do and then being disciplined for making mistakes on said tasks.

47.     Mr. Murray repeatedly asked Project Manager Dave Veagis to institute diversity training at UEC but such training never happened.

48.     Despite doing all the job duties of a foreman, Mr. Murray was not given the title of foreman until sometime in 2019.

49.     In 2018, Mr. Murray worked on a jobsite under Foreman Jeremy Misunis.

50.     Foreman Misunis repeatedly used the word "nigger" on the jobsite.

51.     Mr. Murray reported Foreman Misunis' racist behavior to Project Manager Dave Veagis who stated that he would handle it.

52.     Project Manager Veagis moved Mr. Murray to a different jobsite to keep him away from Foreman Misunis.

53.     Mr. Murray also reported Foreman Misunis' racist behavior to Project Manager Jeremy Tolliver.

54.     A week later, Project Manager Tolliver told Mr. Murray that a note had been put in Foreman Misunis' file.

55.     Other employees joked that Mr. Murray was the only person to ever succeed in filing a complaint against Foreman Misunis.

56.     At one point, Mr. Murray asked Project Manager Tolliver for Scott Flegler's, Defendant's President and Owner, email, but Project Manager Tolliver would not give it to Mr. Murray.

57.    It is not possible for a UEC employee to apply to be a foreman; favorite employees are chosen and groomed for the position.  These employees are usually White.

58.    After fighting to be recognized as a foreman, Mr. Murray was consistently treated worse than White foremen.

59.    Mr. Murray's jobs were always understaffed and had fewer journeymen than required for the number of apprentices onsite; White foremen's jobs were given enough manpower.

60.    Mr. Murray was never given a company credit card, and in fact, he did not even receive a gas card until 2019.

61.    White foremen were given company credit cards and were not disciplined when they used them inappropriately; for instance, buying lunch for their crew.

62.    Defendant knew, or had reason to know, of the rampant harassment and discrimination faced by, and witnessed by, Mr. Murray.

63.    Eventually, Mr. Murray submitted his resignation because he could no longer work in a place with such rampant racism and harassment.  As such, Mr. Murray was constructively discharged in May 2021.

## PLAINTIFF MARIUS RICHARDSON'S GENERAL ALLEGATIONS

64.     Mr. M. Richardson, a Black individual, worked as an Apprentice Electrician for Defendant reporting to several different foremen, who in turn reported to Project Manager Jeremy Tolliver.

65.     The below paragraphs outline some of Mr. M. Richardson's complaints of racism and discrimination that he experienced and witnessed firsthand.

66.     During Mr. M. Richardson's tenure at UEC, he observed White employees receiving preferential treatment on many occasions.

67.     For example, Project Manager Tolliver told Mr. M. Richardson during his initial interview, that he would receive a 90-day and six-month performance review with the opportunity for a raise at each.

68.     Mr. M. Richardson had his 90-day review as an apprentice and was not informed of any performance issues, however, he did not receive a raise.

69.     White employees hired at the same time as Mr. M. Richardson, on the other hand, were given raises during their 90-day review.

70.     Mr. M. Richardson never received his six-month review despite repeatedly asking Project Manager Tolliver when the review would take place.  As such, Mr. M. Richardson had no opportunity for a raise at this time.

71.     White employees hired at the same time as Mr. M. Richardson were given their six-month reviews and received raises at such time.

11

72.     Further, at the start of the workday, Mr. M. Richardson would meet his crew at Defendant's shop in Lansing and the crew would ride together in a company van to the jobsite in Battle Creek.

73.     If Mr. M. Richardson was even five minutes late, the van would leave without him forcing him to drive his own car and pay for his own gas; however, the van would wait over an hour for White employees.

74.     While working at UEC, Mr. M. Richardson heard a variety of racial slurs and epithets directed towards himself and other Black people.

75.     For example, when Mr. M. Richardson started working, a fellow employee informed him that the White employees referred to the Black grommets used on site as "Black assholes."  One employee, Ricky Radamaker, took this a step further calling the Black grommets "Obamas" because he believes President Barack Obama is a "Black asshole."

76.     Mr. M. Richardson heard White employees use the word "nigger" so often it became a part of the air.

77.     At one point, a fellow employee told Mr. M. Richardson to "hurry up" or the employee would "pull out [his] whip."

78.     This same employee told Mr. M. Richardson that the employee was "raised to not like Black people."

79.     The foreman heard these comments and took no action.  In fact, the word "nigger" was a regular aspect of the foreman's own parlance.

80.     When Mr. M. Richardson reported this racism to management, that same foreman told him "you gotta be tougher to work in the trade."  Nothing was done.

81.     Once, during the morning meeting, a White employee named Zachary referred to Lansing, where Mr. M. Richardson lived, as "ghetto."  Zachary could not explain what he meant without referring to Black people who live in Lansing.

82.     Another time, when they were working outside in the winter, that same employee stated, "White people ain't built for this," to which Mr. M. Richardson responded, "and Black people are?"  The White employee had no explanation for his comment.

83.     Additionally, Mr. M. Richardson heard White employees frequently talk about White female customers, specifically stating how the employees were attracted to these women because they were White and that the White employees had never "been with" a Black woman and never would.

84.     When Mr. M. Richardson was hired in January 2020, he was told that UEC had work lined up for years.

85.     At no point during Mr. M. Richardson's tenure at UEC did the amount of work lessen.

86.     Despite this, during Mr. M. Richardson's termination meeting, Project Manager Tolliver told Mr. M. Richardson that UEC had to lay him off due to lack of work.  Project Manager Tolliver further stated that this was part of a larger layoff and said layoffs were occurring in seniority order; however, White employees with less seniority than Mr. M. Richardson were not laid off.

## PLAINTIFF ERIC BURCH'S GENERAL ALLEGATIONS

87.     Mr. Burch, a Black individual, worked as an Apprentice Electrician for Defendant reporting to several different foremen, who in turn reported to Project Manager Jeremy Tolliver.

88.     The below paragraphs outline some of Mr. Burch's complaints of racism and discrimination that he experienced and witnessed firsthand.

89.     While working at UEC, Mr. Burch heard a variety of racial slurs and epithets directed towards himself and other Black people.

90.     For example, when Mr. Burch first met Foreman DJ Shepherd, Foreman Shepherd asked him "what are you?"  Mr. Burch responded that he is a human.  Foreman Shepherd then asked, "But what race are you? Black or White, mixed?"  Mr. Burch questioned why his race mattered to which Foreman Shepherd stated "Because I'm asking.  It matters a lot."

91.     During this same conversation, Foreman Shepherd asked Mr. Burch, if he was "Arab, Muslim, or a towelhead."

92.    Further, the first time Mr. Burch met Foreman Kevin Langdon, Foreman Langdon asked Mr. Burch if he was from Mexico.

93.    Around that same time, Foreman Shepherd told Mr. Burch to "go back to [his] plantation."  Mr. Burch asked where said plantation was and Foreman Shepherd responded, "You know, it's not in America."  When Mr. Burch asked him to stop, Foreman Shepherd stated "I'm gonna get you off my jobsite.  I don't like your kind."

94.    Mr. Burch reported these comments to Project Manager Tolliver who responded, "look, you're here to work.  Don't worry about that."  Nothing was done.

95.    A week after Mr. Burch complained about the racism he was experiencing, Project Manager Tolliver transferred him to a less desirable jobsite in Detroit.

96.    Before the transfer, Mr. Burch had a thirty-minute commute.  After the transfer, his commute was one and one-half to two hours.

97.    Further, there was no work for Mr. Burch at the Detroit jobsite; the foreman in Detroit asked Mr. Burch why he had been transferred because there was nothing to do.

98.    Mr. Burch also heard the word "nigger" repeatedly on jobsites, both directed at himself and generally.  Specifically, Foremen Kevin Langdon and DJ

Shepherd both called Mr. T. Richardson the word "nigger" while speaking to Mr. Burch.

99.    Mr. Burch attempted to report these incidents to Project Manager Tolliver, informing Project Manager Tolliver that Mr. Burch needed to talk to him about racial discrimination, however, Project Manager Tolliver was always too busy for such a conversation.

100.    During his tenure, Mr. Burch observed White employees receiving better treatment than Black employees including the fact that White employees were provided with someone to train them whereas Black employees were thrown into new tasks alone and left to their own devices.

101.    When Mr. Burch was hired, there was plenty of work.  The amount of work did not decrease due to the COVID-19 pandemic.

102.    Despite having plenty of work, Project Manager Tolliver called Mr. Burch and informed him that he was being let go due to lack of work.  Project Manager Tolliver further stated that this was part of a larger layoff and said layoffs were being done in seniority order.  However, White employees with less seniority than Mr. Burch were not laid off at this time.

### PLAINTIFF TYLER RICHARDSON'S GENERAL ALLEGATIONS

103.    Mr. T. Richardson, a Black individual, worked as an Apprentice

Electrician for Defendant reporting to several different foremen who in turn reported to Project Manager Jeremy Tolliver.

104.   The below paragraphs outline some of Mr. T. Richardson's complaints of racism and discrimination that he experienced and witnessed firsthand.

105.   While working at UEC, Mr. M. Richardson heard a variety of racial slurs and epithets directed towards himself and other Black people including the word "nigger" which was used by White employees, including members of management, countless times.

106.   On the jobsites, White employees would frequently bring up politics in order to make negative comments about Black people.  Statements made included comments along the lines of "Black Lives Matter is bullshit."

107.   Mr. T. Richardson also witnessed White employees directing derogatory language towards Mr. Tavera as well as to describe Hispanic members of the other trades.

108.   Management heard these racist comments and slurs being used and laughed.

109.   During Mr. T. Richardson's tenure at UEC, he observed White employees receiving preferential treatment on many occasions.

110.   For instance, White foremen would provide rides from the parking lot to the jobsite in their trucks to White employees while non-White employees had to walk.

111.   Further, non-White employees were not provided the same quality of training as non-White employees.  For example, when Mr. T. Richardson worked on the Red Cedar jobsite, the journeyman who trained him said something along the lines of "I have never trained anyone before, so I don't really know how to do it." White employees were assigned experienced journeymen with training experience as their trainers.

112.   Additionally, Mr. T. Richardson was given the more physically demanding tasks on jobsites, such as carrying heavy objects up and down flights of stairs, while White employees were given the less physically demanding, more technical, tasks.

113.   Shortly before he was terminated, Mr. T. Richardson was sent to work on a jobsite in Detroit along with Mr. Burch, the only other Black employee in his crew.

114.   Transferring to this jobsite more than tripled Mr. T. Richardson's commute time.

115.   At the Detroit jobsite, Mr. T. Richardson worked under Foreman Misunis.

116.   Foreman Misunis did not speak to Mr. T. Richardson when Mr. T. Richardson first started, choosing instead to only give him dirty looks.

117.   One day, at the start of his shift, Mr. T. Richardson and other White employees were at the jobsite waiting to be assigned work.

118.   When Foreman Misunis arrived on the jobsite, he looked at Mr. T. Richardson and said something along the lines of "we're not gonna stand around and do nothing. Come help me out."  Mr. T. Richardson then had to unload tools from the truck while the White employees continued to stand around.

119.   In October 2020, Mr. T. Richardson had more work to do than when he was hired two months prior.

120.   Despite the abundance of work, Project Manager Tolliver cited lack of work as the reason for Mr. T. Richardson's termination.  Project Manager Tolliver further stated that this was part of a larger layoff, and the layoffs were being done in seniority order, however, there were White employees with less seniority than Mr. T. Richardson who were not laid off.

**PLAINTIFF JORDAN SHANK'S GENERAL ALLEGATIONS**

121.   Mr. Shank, a White individual, worked as an Apprentice Electrician for Defendant reporting to Foreman Tim Nolan who in turn reported to Project Manager Jeremy Tolliver.

122.    The below paragraphs outline some of Mr. Shank's complaints of racism and discrimination that he experienced and witnessed firsthand.

123.    Toward the beginning of his employment for Defendant, Mr. Shank worked as the residential foreman on a project run by Foreman Nolan.

124.    In April 2019, Mr. Shank suffered a work-related injury to his back and abdomen while working for Defendant.

125.    Mr. Shank called Project Manager Tolliver to report the injury and sought medical treatment at an urgent care where he was diagnosed with a hernia.

126.    Mr. Shank was off work for one and a half months and received short term disability payments during this time.

127.    When Mr. Shank returned to work, he continued to work as the residential foreman with lifting restrictions.

128.    A few weeks after Mr. Shank returned to work, Project Manager Tolliver replaced Mr. Shank as residential foreman with a non-disabled employee who did not have lifting restrictions.

129.    The new residential foreman was less qualified than Mr. Shank because the new residential foreman had never managed any aspect of a project before.

130.    Despite this demotion, Mr. Shank did his best to train and assist the new residential foreman.

131.   In September 2019, Mr. Shank worked on a job which required him to meet the crew at the shop in Lansing and ride in a company van out to the jobsite in Battle Creek.

132.   The company van did not have seatbelts and needed its shock absorbers replaced.

133.   After riding in the van, Mr. Shank reported these safety concerns to Project Manager Tolliver.

134.   Project Manager Tolliver informed Mr. Shank that company policy dictated that Mr. Shank was to ride in the van and if he chose to drive his own vehicle, he was not entitled to reimbursement for gas.

135.   In another instance of disregard for employee safety, Project Manager Tolliver ordered Mr. Shank to cut through live wires while on a jobsite because Mr. Shank was "taking too long" to disconnect the wires.

136.   Further, Mr. Shank observed OSHA violations on each and every jobsite he was assigned; he reported these violations to Project Manager Tolliver. Nothing was done.

137.   During Mr. Shank's tenure at UEC, he observed White employees receiving preferential treatment on many occasions, including the fact that only White employees were sent to prevailing wage jobs which paid more than other jobs.

138.   Mr. Shank heard Foreman Shepherd refer to Black employees, including Mr. Burch, as "nigger."

139.   Further, Mr. Shank frequently heard Foreman Langdon call Black employees the word "nigger" and specifically witnessed Foreman Langdon call Mr. Burch the word "nigger."  In this instance, Mr. Shank told Foreman Langdon that his language was inappropriate.

140.   In April 2020, after opposing racism, Foreman Langdon forced Mr. Shank to dig trenches by hand while other employees were allowed to use the backhoe.  Foreman Langdon stated something along the lines of, "I don't care if [Mr. Shank] digs ditches all day."

141.   In the fall of 2020, Project Manager Tolliver called Mr. Shank in for a meeting where he terminated Mr. Shank.

142.   Project Manager Tolliver told Mr. Shank that he was being terminated because things "just aren't working out" and "the company feels that you belong with a smaller practice where you can get more one on one practice."

143.   During this termination meeting, Mr. Shank again tried to report racism he witnessed, but Project Manager Tolliver was not receptive.

**<u>COUNT I</u>**
**RACIAL HARASSMENT AND DISCRIMINATION**
**IN VIOLATION OF 42 U.S.C. § 1981**

**On behalf of Plaintiffs Gabriel Tavera, Vance Murray, Marius Richardson, Eric Burch, and Tyler Richardson**

144.   Plaintiffs incorporate by reference all preceding paragraphs.

145.   Section 1981 prohibits racial discrimination by actors such as the Defendant.

146.   Mr. Tavera is Hispanic.

147.   Messrs. Murray, M. Richardson, Burch, and T. Richardson are African American.

148.   Plaintiffs faced intentional harassment and discrimination based on race.

149.   Defendant and its agents were well aware of the rampant and continuous racial harassment and discrimination faced by Plaintiffs and repeatedly disregarded Plaintiffs' pleas for help and refused to initiate corrective measures.

150.   Defendant is liable for the harassment and discrimination and retaliatory hostile environment experienced by Plaintiffs because it caused the harassment and had knowledge of such harassment and did not initiate any corrective measures.

**WHEREFORE**, Plaintiffs request that this Honorable Court enter an order:

A.     Granting them all available compensatory damages for economic injury, extreme mental and emotional distress, humiliation, outrage, economic damages, loss of employment opportunity, harm to reputation, loss of earning capacity, punitive, and all other damages available under law;

B.    Ordering appropriate injunctive relief requiring Defendant United Electrical Contractors to immediately implement all necessary corrective measures, such as mandatory training of all supervisory personnel and employees and an effective complaint process for harassment, to end the illegal harassment, discrimination and retaliation described in the allegations above;

C.    Granting Plaintiffs' reasonable attorney's fees and costs incurred in this litigation; and

D.    Granting Plaintiffs all such further legal and equitable relief as this Court deems appropriate to make Plaintiffs whole.

## <u>COUNT II</u>
### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

**On behalf of Plaintiffs Gabriel Tavera, Vance Murray, Marius Richardson, Eric Burch, Tyler Richardson, and Jordan Shank**

151.   Plaintiffs incorporate by reference all preceding paragraphs.

152.   Section 1981 prohibits retaliation by employers against individuals who oppose violations of § 1981.

153.   Plaintiffs opposed violations of § 1981.

154.   Defendant knew, or had reason to know, that Plaintiffs opposed violations of § 1981.

155.   In violation of § 1981, Defendant retaliated against Plaintiffs for opposing violations of § 1981.

**WHEREFORE**, Plaintiffs request that this Honorable Court enter an order:

A.     Granting them all available compensatory damages for economic injury, extreme mental and emotional distress, humiliation, outrage, economic damages, loss of employment opportunity, harm to reputation, loss of earning capacity, punitive, and other damages.

B.     Ordering appropriate injunctive relief requiring Defendant United Electrical Contractors to immediately implement all necessary corrective measures, such as mandatory training of all supervisory personnel and employees and an effective complaint process for harassment, to end the illegal harassment, discrimination and retaliation described in the allegations above;

C.     Granting Plaintiffs' reasonable attorney's fees and costs incurred in this litigation; and

D.     Granting Plaintiffs all such further legal and equitable relief as this Court deems appropriate to make Plaintiffs whole.

<u>**COUNT III**</u>
**RACIAL HARASSMENT AND DISCRIMINATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**

**On behalf of Plaintiffs Gabriel Tavera, Vance Murray, Marius Richardson, Eric Burch, and Tyler Richardson**

156.   Plaintiffs incorporate by reference all preceding paragraphs.

157.   The Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101 et. seq., prohibits racial harassment and discrimination against protected persons in the workplace, and

obligates employers to take certain steps to prevent such harassment and discrimination.

158.   Defendant is an employer as defined by Michigan's Elliott-Larsen Civil Rights Act ("Elliott-Larsen"), M.C.L. § 37.2201(a).

159.   Mr. Tavera is Hispanic.

160.   Messrs. Murray, M. Richardson, Burch, and T. Richardson are African American.

161.   Plaintiffs faced harassment and discrimination based on race.

162.   Defendant and its agents were well aware of the rampant and continuous racial harassment and discrimination faced by Plaintiffs and repeatedly disregarded Plaintiffs' pleas for help and refused to initiate corrective measures.

163.   Defendant is liable for the harassment and discrimination and retaliatory hostile environment experienced by Plaintiffs because it caused the harassment and had knowledge of such harassment and did not initiate any corrective measures.

**WHEREFORE**, Plaintiffs request that this Honorable Court enter an order:

A.   Granting them all available compensatory damages for economic injury, extreme mental and emotional distress, humiliation, outrage, economic damages, loss of employment opportunity, harm to reputation, loss of earning capacity, and all other damages available under law.

B.      Ordering appropriate injunctive relief requiring Defendant United Electrical Contractors to immediately implement all necessary corrective measures, such as mandatory training of all supervisory personnel and employees and an effective complaint process for harassment, to end the illegal harassment, discrimination and retaliation described in the allegations above;

C.      Granting Plaintiffs' reasonable attorney's fees and costs incurred in this litigation; and

D.      Granting Plaintiffs all such further legal and equitable relief as this Court deems appropriate to make Plaintiffs whole.

## COUNT IV
### NATIONAL ORIGIN HARASSMENT AND DISCRIMINATION IN VIOLATION OF THE ELIOTT LARSEN CIVIL RIGHTS ACT
**On behalf of Plaintiff's Gabriel Tavera and Eric Burch**

164.    Plaintiffs incorporate by reference all preceding paragraphs.

165.    The Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101 et. seq., prohibits harassment and discrimination on the basis of national origin against protected persons in the workplace, and obligates employers to take certain steps to prevent such harassment and discrimination.

166.    Defendant is an employer as defined by Michigan's Elliott-Larsen Civil Rights Act ("Elliott-Larsen"), M.C.L. § 37.2201(a).

167.  Mr. Tavera is Hispanic and UEC employees perceived him as an immigrant from Mexico.

168.  UEC employees perceived Mr. Burch as hailing from somewhere outside the United States.

169.  Plaintiffs faced harassment and discrimination based on their national origin and perceived national origin.

170.  Defendant and its agents were well aware of the rampant and continuous harassment and discrimination faced by Plaintiffs and repeatedly disregarded Plaintiffs' pleas for help and refused to initiate corrective measures.

171.  Defendant is liable for the harassment and discrimination and retaliatory hostile environment experienced by Plaintiffs because it caused the harassment and had knowledge of such harassment and did not initiate any corrective measures.

**WHEREFORE**, Plaintiffs request that this Honorable Court enter an order:

A.    Granting them all available compensatory damages for economic injury, extreme mental and emotional distress, humiliation, outrage, economic damages, loss of employment opportunity, harm to reputation, loss of earning capacity, and all other damages available under law.

B.    Ordering appropriate injunctive relief requiring Defendant United Electrical Contractors to immediately implement all necessary corrective measures,

such as mandatory training of all supervisory personnel and employees and an effective complaint process for harassment, to end the illegal harassment, discrimination and retaliation described in the allegations above;

C.      Granting Plaintiffs' reasonable attorney's fees and costs incurred in this litigation; and

D.      Granting Plaintiffs all such further legal and equitable relief as this Court deems appropriate to make Plaintiffs whole.

<u>COUNT V</u>
**RETALIATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**

**On behalf of Plaintiffs Gabriel Tavera, Vance Murray, Marius Richardson, Eric Burch, Tyler Richardson, and Jordan Shank**

172.   Plaintiffs incorporate by reference all preceding paragraphs.

173.   Defendant is an employer as defined by Michigan's Elliott-Larsen Civil Rights Act ("Elliott-Larsen"), M.C.L. § 37.2201(a).

174.   Elliot-Larsen states that an employer shall not "retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." M.C.L. § 37.2701(a).

175.   Plaintiffs opposed violations of Elliott-Larsen.

176.   Defendant knew, or had reason to know, that Plaintiffs opposed violations of Elliott-Larsen.

177.  In violation of Elliott-Larsen, Defendant retaliated against Plaintiffs for opposing violations of Elliott-Larsen.

**WHEREFORE**, Plaintiffs request that this Honorable Court enter an order:

A.  Granting them all available compensatory damages for economic injury, extreme mental and emotional distress, humiliation, outrage, economic damages, loss of employment opportunity, harm to reputation, loss of earning capacity, and all other damages available under law.

B.  Ordering appropriate injunctive relief requiring Defendant United Electrical Contractors to immediately implement all necessary corrective measures, such as mandatory training of all supervisory personnel and employees and an effective complaint process for harassment, to end the illegal harassment, discrimination and retaliation described in the allegations above;

C.  Granting Plaintiffs' reasonable attorney's fees and costs incurred in this litigation; and

D.  Granting Plaintiffs all such further legal and equitable relief as this Court deems appropriate to make Plaintiffs whole.

## <u>COUNT VI</u>
## DISABILITY HARASSMENT AND DISCRIMINATION IN VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT
### On behalf of Plaintiff Jordan Shank

178.  Plaintiffs incorporate by reference all preceding paragraphs.

179.   During all material times, Plaintiff Jordan Shank was a disabled person as defined by the Michigan's Persons with Disabilities Civil Rights Act, M.C.L. § 37.1103(d).

180.   Mr. Shank suffered from a physical impairment that substantially limited one or more major life activity in that his doctor issued restrictions on the amount of weight he could lift.  Mr. Shank was also "regarded as" disabled by Defendant.

181.   Defendant is a covered entity and employer as defined by M.C.L. § 37.1201(b).

182.   In violation of the M.C.L. § 37.1202, Defendant discriminated against Mr. Shank on the basis of his known disability by demoting him from his position as a foreman.

**WHEREFORE**, Plaintiffs request that this Honorable Court enter an order:

A.   Granting them all available compensatory damages for economic injury, extreme mental and emotional distress, humiliation, outrage, economic damages, loss of employment opportunity, harm to reputation, loss of earning capacity, punitive, and other damages.

B.   Ordering appropriate injunctive relief requiring Defendant United Electrical Contractors to immediately implement all necessary corrective measures, such as mandatory training of all supervisory personnel and employees and an

effective complaint process for harassment, to end the illegal harassment, discrimination and retaliation described in the allegations above;

C.    Granting Plaintiffs' reasonable attorney's fees and costs incurred in this litigation; and

D.    Granting Plaintiffs all such further legal and equitable relief as this Court deems appropriate to make Plaintiffs whole.

Respectfully submitted,


MILLER COHEN PLC

By: */s/ Richard Mack*
     Richard G. Mack (P58657)
     Andrea F. Frailey (P82466)
     Attorneys for Plaintiffs
     7700 Second Avenue, Suite 335
     Detroit, Michigan 48202
     (313)964-4454
Dated: January 20, 2022    richardmack@millercohen.com
     afrailey@millercohen.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**VANCE MURRAY, ERIC BURCH,  TYLER
RICHARDSON, MARIUS RICHARDSON,
JORDAN SHANK, and GABRIEL TAVERA**

       Plaintiffs,                    **Case No.**

v.                                                       **Hon.**

**UNITED ELECTRICAL CONTRACTORS,
INC.,**

       Defendant.

---

**MILLER COHEN, P.L.C.**
Richard G. Mack (P58657)
Andrea F. Frailey (P82466)
*Attorneys for Plaintiffs*
7700 Second Ave, Ste 335
Detroit, MI 48202
(313) 964-4454
richardmack@millercohen.com
afrailey@millercohen.com

---

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a jury consistent with the Court Rules, for

all issues so triable.

Respectfully submitted,


MILLER COHEN PLC

By: */s/ Richard Mack*_____
  Richard G. Mack (P58657)
  Andrea F. Frailey (P82466)
  Attorneys for Plaintiffs
  7700 Second Avenue, Suite 335
  Detroit, Michigan 48202
  (313)964-4454
Dated:  January 20, 2022  richardmack@millercohen.com
  afrailey@millercohen.com

34